Adrienne Urrutia Zuflacht (argued), San Antonio, TX, for Defendant–Appellant.

Before HIGGINBOTHAM and PARKER, Circuit Judges, and ATLAS,* District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal brings questions regarding the authority of a magistrate judge to preside in a federal prosecution of a felony after the jury has commenced its deliberations. Javier Abud Lopez asks us to reverse his conviction, urging that judicial power has been unconstitutionally delegated, a contention bristling with difficult issues under Article III of the Constitution.

The government concedes that the record is inadequate for this appeal because it does not fully disclose the events relevant to the respective roles played by the judge of the district court and the magistrate judge.

We are persuaded that this case must be remanded to the district court with instructions to settle the record regarding the pre-verdict events and the respective roles played by the United States District Court Judge and the Magistrate Judge. The district court should first determine what transcripts may yet be obtained from the electronic recordings and conduct such hearings or other proceedings as necessary to develop the best record possible to assist this court in deciding this appeal. The defendant has served much of his sentence due to the delays entailed by difficulties in the record. To assist this court in deciding this case as quickly as possible, the district court should proceed promptly. The panel retains jurisdiction.

REMANDED for further proceedings.

**Leslie Dale MARTIN, Petitioner–
Appellant,**

v.

**Burl CAIN, Warden, Louisiana State
Penitentiary, Respondent–
Appellee.**

No. 99–30585.

United States Court of Appeals,
Fifth Circuit.

March 8, 2000.

* District Judge of the Southern District of Texas, sitting by designation.

Rebecca L. Hudsmith (argued), Lafayette, LA, for Petitioner–Appellant.

Frederick Wayne Frey (argued), Lawrence Babineaux, Mike K. Stratton, Robert Bryant, Lake Charles, LA, for Respondent–Appellee.

Before KING, Chief Judge, and BARKSDALE and STEWART, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Leslie Dale Martin, sentenced to death in Louisiana state court for first degree murder, appeals the denial of his habeas application, the district court having granted a Certificate of Appealability (COA) on two interrelated claims regarding the testimony of the State's key witness concerning Martin's committing the murder in connection with aggravated rape: ineffective assistance of counsel and a *Brady* claim. *AFFIRMED*.

### I.

On 20 June 1991, Martin went to a bar in Lake Charles, Louisiana, where his companion, Roland, introduced him to the victim. Around 7:30 the next morning, Martin told his work supervisor that he had met a college student, left the bar with her, and woke up alone on Galveston Beach. The supervisor noticed scratches on Martin's forehead, neck, and shoulder that had *not* been there the day before.

When Martin returned to his aunt's home (where he was residing), wearing different clothes from the previous night, and *no* shirt or shoes, his cousin observed scratches on his chest and back, a bite mark on his shoulder, and a tear under his tongue. Martin explained he had fought a "country boy" at the bar.

That same morning, Martin related to another, Rushing, he thought he may have killed someone the previous night, and asked him for an alibi. Although Rushing refused, Martin confided that the victim had threatened to report him for rape. Martin mentioned a shed in Iowa, Louisiana, and stated that he had choked the victim with a rope, cut her throat, dug her eyes out, and jumped up and down on a wooden board placed on her neck. Rushing testified that Martin, who had served several years of a ten-year sentence for sexual battery, told him (Rushing) "he didn't want to be turned in for rape again".

Rushing did *not* believe Martin's story; but, nine days later, when he learned the victim had been missing since leaving the bar, he provided the information to police. During a search of sheds in the Iowa area, authorities discovered the victim's decom-

posing body, with a rope around her neck, and a wooden board containing human blood nearby. There was little forensic evidence. A tampon taken from the body tested negative for seminal fluid; but, a forensic expert testified that, due to decomposition, the test could be a "false negative".

Under Louisiana law, first degree murder includes "killing ... a human being ... [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... aggravated rape...." LA.REV.STAT. ANN. § 14:30(A)(1). Rape is aggravated "[w]hen the victim resists the act to the utmost, but whose resistance is overcome by force". LA.REV.STAT. ANN. § 14:42(A)(1).

Trial testimony indicated there may have been a time lapse between the charged rape and the murder. On direct appeal, the Louisiana Supreme Court noted that, "when the sexual crime and the homicide 'formed one continuous transaction'", the elements of § 14:30(A)(1) are met. *State v. Martin*, 645 So.2d 190, 194 (La.1994) (quoting *State v. Copeland*, 530 So.2d 526, 540 (La.1988) (holding that raping victim, driving across parish line, and then committing murder, was "one continuous transaction")). In any event, Martin confirmed at oral argument here that he is claiming there was *no* rape, *not* that a time lapse between the charged rape and charged murder would preclude the capital conviction.

Three inmates who had been incarcerated with Martin after his arrest, Williamson, Fontenot, and Sweet, each testified, in varying detail, that Martin told them he had sexual relations with the victim; she accused him of rape; and he killed her, because he did *not* want to return to prison. But, *only* Sweet's testimony established aggravated rape:

Q: [PROSECUTOR] You said that he didn't say where they went, it was to be together, but what happened then?

A: Well, he said that he wanted to have sex with her.

Q: Uh-huh (yes).

A: But she refused because her ministration [sic] was on.

. . . .

Q: What did he do then?

A: He said he had to have her.

Q: Okay.

A: So he overpowered her.

Q: He overpowered her. Did he tell you how he overpowered her?

A: He struggled with her.

Q: He struggled with her?

A: Yes, sir.

Q: Did he tell you if she fought back?

A: Yes, she did. She resisted.

Q: And what happened then?

A: He overpowered her and had sex with her.

. . . .

Q: ... Did he tell you what happened next?

A: Yes. He said that after he was finished she became hysterical and went to threatening him about she was going to tell the police, and that he was wrong for what he did.

Q: She was hysterical at the time according to him?

A: Yes, sir.

. . . .

Q: What did he think then? Did he tell you what he was thinking about then?

A: He said he was thinking about going back to the prison.

Q: Okay.

A: And he said he wasn't going back to prison for nobody.

Q: What happened next?

A: He said his mind clicked and he began to choke her.

. . . .

Q: Did he tell you if she was fighting back?

A: Yes, sir, she was struggling.

Q: While he was trying to kill her?

A: Yes, sir.

In May 1992, the jury found Martin guilty of first degree murder. After a penalty phase hearing, it found that he should be sentenced to death, as a result of finding the following aggravating circumstances: the aggravated rape and that the offense was committed in an especially heinous, atrocious, and cruel manner.

■ On direct appeal, Martin contended, *inter alia*, that the State, at most, proved forcible, *not aggravated*, rape. *Martin*, 645 So.2d at 194. The former occurs when "the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape". La.Rev.Stat. Ann. § 14:42.1. The difference between aggravated and forcible rape is "the degree of force" and "the extent of resistance". *Martin*, 645 So.2d at 195 (citing *State v. Parish*, 405 So.2d 1080 (La.1981)).

The Louisiana Supreme Court affirmed Martin's conviction and death sentence, based, *inter alia*, on the victim's small size and Sweet's testimony that she "refused [Martin's] advances, that he struggled with her and she fought back, and that he overpowered her". *Martin*, 645 So.2d at 195. (The sufficiency of the evidence for aggravated rape is *not* one of the certified issues here.) The Supreme Court of the United States denied certiorari. *Martin v. Louisiana*, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260, *reh'g denied*, 515 U.S. 1179, 116 S.Ct. 20, 132 L.Ed.2d 904 (1995).

In April 1997, the state district court, having held a two-day evidentiary hearing that January, denied Martin's application for post-conviction relief. *State v. Martin*, No. 9459–91. The claims certified for appeal by the federal district court are the same as two of the many rejected by the state district court.

Martin filed a federal habeas application, presenting 17 claims, in November 1998. The district court, adopting the detailed and comprehensive report and recommendation of the magistrate judge, denied relief. Subsequently, it granted a COA on two claims regarding Sweet's testimony: whether Martin received ineffective assistance of counsel; and whether the State violated its disclosure obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

### II.

■ The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–32, 110 Stat. 1214 (AEDPA), applies because, subsequent to its enactment, Martin filed his federal application. *Green v. Johnson*, 116 F.3d 1115, 1119–20 (5th Cir.1997). Under AEDPA, a COA, granted by a circuit justice or judge, is required for our reviewing a claim. 28 U.S.C. § 2253; *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir.1997). As noted, Martin's COA allows review of two claims: *Brady*; and ineffective assistance of counsel.[1]

■ Under AEDPA, habeas relief is *not* available to a state prisoner

with respect to any claim that was *adjudicated on the merits* in the State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable

---

**1.** In his brief, Martin requests "a COA with respect to the full range" of the claimed counsel deficiencies and *Brady* violations, as presented in his habeas petition. *See United States v. Kimler*, 150 F.3d 429, 430 (5th Cir. 1998) (noting that we may certify issues not certified by the district court, if petitioner explicitly requests it). But, because these requests are *not* briefed, we will *not* consider them. *See, e.g., Dardar v. Lafourche Realty Co.*, 985 F.2d 824, 831 (5th Cir.1993) ("[q]uestions posed for appellate review but inadequately briefed are considered abandoned").

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). Therefore, "pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), and questions of fact are reviewed under § 2254(d)(2)". *Corwin v. Johnson*, 150 F.3d 467, 471 (5th Cir.), *cert. denied*, 525 U.S. 1049, 119 S.Ct. 613, 142 L.Ed.2d 548 (1998).

■ As a result, in reviewing a question of law, habeas relief *cannot* be granted unless, pursuant to § 2254(d)(1), the state court's "decision rested on a legal determination that was contrary to ... clearly established federal law as determined by the Supreme Court". *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir.) (internal quotation marks and citation omitted), *cert. denied*, 521 U.S. 1123, 117 S.Ct. 2518, 138 L.Ed.2d 1019 (1997). Likewise, pursuant to the same subpart, we "will not disturb a state court's application of law to facts unless the state court's conclusions involved an 'unreasonable application' of clearly established federal law as determined by the Supreme Court". *Davis v. Johnson*, 158 F.3d 806, 812 (5th Cir.1998) (quoting 28 U.S.C. § 2254(d)(1)), *cert. denied*, —— U.S. ——, 119 S.Ct. 1474, 143 L.Ed.2d 558 (1999); *Lockhart*, 104 F.3d at 57.

■ The standard for showing such "application of federal law is unreasonable" is quite difficult. It is satisfied *only* if "reasonable jurists considering the question *would be of one view* that the state court ruling was incorrect". *Davis*, 158 F.3d at 812 (internal quotation marks and citation omitted; emphasis added).

■ This "reasonable-jurists-be-of-one-view" standard governs Martin's claims. *See Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir.1999) (whether State must disclose evidence under *Brady* "is a mixed question of law and fact"); *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir.1998) (ineffective assistance claims "present a mixed question of law and fact").

■ In this regard, Martin suggests our reconsidering our circuit's interpretation of § 2254(d)(1) in the light of the Supreme Court's considering application of the subpart in *Williams v. Taylor*, 163 F.3d 860 (4th Cir.1998), *cert. granted*, —— U.S. ——, 119 S.Ct. 1355, 143 L.Ed.2d 516 (1999). But, we are bound by our precedent, pending change of law or Supreme Court decision. *See Hughes v. Johnson*, 191 F.3d 607, 612 (5th Cir.1999); *Corwin*, 150 F.3d at 472.

In his brief, Martin asserts also that the state district court's concluding, on post-conviction review, that "the standard for a *Brady* violation ha[d] not been met", was *not* a "full and fair adjudication", and therefore, subpart (d)(1) should *not* apply. At oral argument here, however, Martin acknowledged its applicability. Accordingly, he appears to have abandoned this contention. In any event, as did the district court, we find this contention meritless.

■ A criminal defendant may establish a *Brady* violation, affecting his constitutional right to due process, by showing that the prosecution suppressed favorable evidence, *including impeachment evidence*, material to his guilt. *Jackson v. Johnson*, 194 F.3d 641, 648–49 (5th Cir. 1999). *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The State's good or bad faith" in depriving the defendant of exculpatory evidence "is irrelevant", *Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir.1997) (citing *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); and the reviewing court must assess "the cumulative effect" of the nondisclosure. *Hughes*, 191 F.3d at 629 (citing *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"; and such "'reasonable probability' is a probability sufficient to undermine confidence in the outcome". *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. Therefore, Martin must "show[] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict". *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555; *Hughes*, 191 F.3d at 629.

*Brady*'s "materiality" standard "is identical to" the prejudice standard Martin must satisfy to prevail on his ineffective assistance claim. *Johnson v. Scott*, 68 F.3d 106, 109–10 (5th Cir.1995). For the latter, he must likewise demonstrate "a reasonable probability that, but for counsel's unprofessional errors", the verdict would have been different. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Davis*, 158 F.3d at 812. (Because, as discussed *infra*, the requisite prejudice is lacking, we need *not* address the other prong of the *Strickland*-test: deficient performance *vel non* by counsel.)

### A.

For the two interrelated, certified claims, Martin contends that, contrary to *Brady*, the State failed to produce, and his counsel, due to inadequate investigation, contrary to *Strickland*,[2] failed to discover, substantial impeachment evidence relative to Sweet: in his pre-trial video statement, cell location history, and criminal record.

### 1.

On 17 July 1991, nine months before trial, and approximately two weeks after Martin's arrest, Sweet provided for the sheriff's office a videotaped statement about Martin. That September, Martin requested witness statements and any *Brady* material. Responding that there was *no Brady* material, the State refused to disclose the statements.

In May 1992, 11 days before trial, Martin filed a supplemental motion for exculpatory evidence, again requesting discovery, or an *in camera* inspection, of certain inmate statements, including Sweet's. At the motion hearing, the State objected to disclosure, again claiming *no Brady* material. Based on that representation, the motion was denied.

On the other hand, before the State rested in the guilt-innocence phase (but after the inmate-witnesses had testified), the trial court *did* offer Martin's counsel an opportunity to inspect the requested statements. Counsel asked the judge to review the statements instead.

The judge did so. At a bench conference, he related that, in the video, Sweet stated that Martin told him he and the victim had been drinking, and "they had sex but she didn't want to do it, but he was all worked up and he overpowered her and she was hysterical". The judge also reviewed and related portions of the statements by Fontenot, Williamson, and three inmates who did *not* testify. The judge reminded Martin's counsel that, if they used portions of the statements, the State could use the rest.

Again, only Sweet's testimony supported aggravated rape. Martin contends that this *late disclosure*, and his counsels' failure to *independently review* the statements, prejudiced his defense, asserting that, during closing arguments, the prosecutor "compounded" the *Brady* violation by using Sweet's pre-trial statement, *not*

---

**2.** Martin's trial counsel, Pitre and Williams, were appointed to replace the public defender on 30 March 1991, 42 days before trial. At the state post-conviction evidentiary hearing, Williams testified that he spent 60 hours, at most, on the case; the majority of Pitre's time, as lead counsel, was apparently spent seeking a continuance. *See Martin*, 645 So.2d at 197 (discussing denial of continuance).

produced to Martin, to strengthen Sweet's credibility.

Sweet and Martin became reacquainted in July 1991 when Martin, having recently arrived at the jail, reminded Sweet they had known each other previously. They were in the same jail section that July (the offense was in late June) when Sweet gave his video statement, and thereafter, becoming cell mates later that summer, from 31 August to 4 September. Martin contends that the following differences between Sweet's pre-trial statement and his trial testimony could have been used to impeach him.

First, Sweet testified that Martin told him details of the murder; in the statement, that Martin told him only that he "grabbed [the victim] with both hands around the neck ... [and] he killed her then", and "didn't get into details".

Second, without mentioning any earlier consensual activity by the victim, Sweet testified that Martin said the victim refused to have sexual relations because of her "ministration"; in the statement, that Martin "was all worked up because [the victim] had been kissing on him and hugging all on him and he was aroused and she didn't want to go through with it ... for some unknown reason".

Third, Sweet testified that Martin told him his friend, "Pinky" (Rushing's nickname), "turned him in"; in the statement, that Martin never mentioned the name of the informant. (Martin notes that Sweet also related that the same friend was with Martin when he met the victim, but trial testimony established that it was Roland, *not Rushing.*)

Fourth, and finally, Sweet testified that Martin never told him the victim was intoxicated or that he had been drinking; in the statement, that Martin said "they had been drinking".

The discrepancies between Sweet's statement and testimony are favorable to Martin, because they could have been used in an attempt to impeach Sweet's credibili-

ty. And, because Sweet was the "key witness on an essential issue", *United States v. Weintraub,* 871 F.2d 1257, 1262 (5th Cir.1989), then, arguably, the evidence was material. *See Wilson v. Whitley,* 28 F.3d 433, 439 (5th Cir.1994) (finding withheld evidence material, relative to testimony "essential" to defendant's conviction).

Martin also contends that his counsel failed to properly cross-examine Sweet when, in response to a question by defense counsel, Sweet stated: "I don't know if [Martin] said he raped her or had sex with her". Martin's counsel did *not* question him further about this inconsistency.

The State responds that the differences in Sweet's statement and testimony can be explained by the fact that, when Sweet gave the statement, he and Martin had only been in the same jail about two weeks, and Martin could have told Sweet the details later, when they became cell mates. It asserts that the video contained *no Brady* material, *until* Sweet gave the somewhat differing testimony at trial; notes that it *did disclose* his statement during trial; and maintains that his testimony is reliable because, about eight years prior to their joint incarceration, Sweet and Martin had formed a friendship in a juvenile facility.

■ On post-conviction review, the state district court concluded that "[a] comparison of the video statement and trial testimony of Sweet fail[ed] to reveal inconsistencies sufficient to possibly impeach". It also concluded that, because Sweet's referenced un-followed-up-testimony was made in the presence of the jury, there was *no* prejudice.

The federal magistrate judge observed that some inconsistencies between Sweet's statement and testimony could *not* be explained by his later acquiring more details, *e.g.,* his differing statements about whether Martin and the victim had been drinking, but recommended nevertheless that the statement's impeachment value was subject to reasonable debate. The magis-

trate judge also recommended that Martin had failed to show prejudice in his counsel's now challenged failure to further question Sweet, because doing so "may have simply allowed Sweet an opportunity to explain [it] away".

We agree with the magistrate judge's reasoning, adopted by the district court. Martin's counsel could have impeached Sweet generally with his prior inconsistent statements (in the pre-trial statement and his testimony on cross). But, as the magistrate judge recommended, what is *material* (reasonable probability that result of the trial would have been different) is Sweet's description of the victim's resistance and it being overpowered. In that regard, Sweet's statement and testimony are consistent. Pursuant to the high standard for habeas relief under § 2254(d)(1), it is *not* available on this issue.

### 2.

■ Martin asserts that, because of inadequate investigation, it was only post-trial that his counsel learned Sweet and Martin were *not* in the same cell in July 1991, when Sweet claimed Martin confessed; and, in fact, were cell mates only much later, that August–September, and then for only four days. He contends that, although Sweet's account of his (Martin's) confession—*e.g.*, Martin's pacing the floor of their cell at night on several occasions—sounds rational had it occurred over the "about two months" Sweet testified he and Martin shared a cell, it is *not* compatible with a four-day time span. Martin asserts that the state district court overlooked the significance of Sweet's testimony that he was actually Martin's cell mate when Martin confessed, only to him, the details necessary to establish aggravated rape, and points out that, in its closing argument, the State used Sweet's "cell mate" status to

persuade the jury his account was believable.[3]

Sweet and Martin were in the same cell only from 31 August to 4 September. The state district court found, however, they were in the same "pod" from 9 July through 25 August 1991, with "access to each other daily from about 5:00 a.m. until 10:00 or 11:00 p.m".

In the light of their extensive opportunities to visit, and Sweet's testimony that Martin "went into details on a different occasion", counsels' failure to discover Sweet's cell location history does *not* translate into a reasonable probability that, but for that failure, the verdict would have been different. As with the first issue, this issue does *not* satisfy the high standard for § 2254(d)(1).

### 3.

■ Martin maintains also that he was prejudiced by the State's failure to disclose, and counsels' failure to discover (and utilize for impeachment), Sweet's full criminal record, which included several prior convictions (for theft and "unauthorized use of a movable", and for simple assault), as well as pending charges (Sweet absconded with over $500 in parish funds given him for use as an undercover narcotics informant, and threatened to kill the officer who subsequently arrested him). In particular, Martin's counsel was unable to counter Sweet's trial testimony that he had *only one* criminal offense—for cocaine distribution.

The record indicates, and the state district court determined, that the State provided Sweet's criminal record to Martin's counsel at a pre-trial hearing. At a hearing on Martin's new trial motion, however, Martin's counsel testified that the State

---

**3.** Martin contends that the state district court's rejection of this issue was, pursuant to § 2254(d)(2), "based on an unreasonable determination of the facts...." We find this claim—which is *not* included in the COA, *see* note 1, *supra*—without merit, in the light of

the fact that, after a two-day evidentiary hearing, that court was fully aware of the time period in which Martin and Sweet were in the same section, and when they were cell mates, as discussed *infra*.

provided only "a typewritten list of some charges against one inmate" (unidentified in the record).

The state district court noted that: Sweet testified at trial in his prison uniform; the jury was aware he had one prior felony conviction and was currently in prison; and evidence of the then pending charges, admissible only to show bias or prejudice, would *not* have been admitted, because Sweet denied any promise by the State of leniency or a plea bargain. As a result, it held that Martin had *not* shown the requisite prejudice.

In his report and recommendation, the magistrate judge determined also that the "pending charges could not have been properly presented to the jury", citing *State v. Grace,* 643 So.2d 1306, 1308 (La. Ct.App.1994). Martin contends that his situation is distinguishable because, due to counsels' ineffective investigation, Martin did *not* have an opportunity, as did the defendant in *Grace,* to support admissibility by showing bias or prejudice.

For this issue, as with the other two, the state court decision was *not* outside the standard set by § 2254(d)(1).

### B.

As he did in district court, Martin asserts that, cumulatively, the referenced suppressed or undiscovered impeachment evidence translates into the requisite prejudice. He contends that the only other evidence of aggravated rape, the scratches and other physical injuries (bite mark on shoulder and tear under tongue) observed by witnesses, could have been caused by his claimed fight at the bar. (As noted, according to Martin's cousin, Martin said the injuries resulted from a fight there with a "country boy".)

The State responds that evidence in addition to Sweet's testimony supported finding aggravated rape: Martin's physical injuries; the removal of the victim's clothing; and the logical inference that, had the sexual relations been consensual,

Martin would have had *no* reason to kill her. While the State acknowledges that "Sweet is the only State witness who testified that [Martin] *told him* he raped the victim" (emphasis added), it asserts that Williamson, Fontenot, and Rushing's testimony also supported aggravated rape, because they "relayed the last words of [the victim]"—that Martin "took advantage of her" (Williamson) or raped her (Fontenot and Rushing).

Martin replies that this contention by the State—the victim "spoke through" Martin and then through the inmates—is hearsay within hearsay, and *cannot* be used to establish aggravated rape, because such evidence is too unreliable. In support, he cites *State v. Lubrano,* 563 So.2d 847, 849 (La.1990) ("[w]here the state's case rests *entirely* on hearsay evidence ... counsel's failure to object does not necessarily foreclose inquiry into the reliability of the result") (emphasis in original); and *State v. Allien,* 366 So.2d 1308, 1312 (La.1978) (reversing conviction where "unobjected to hearsay" was "exclusive evidence of a defendant's guilt"). Martin maintains that, by taking the victim's alleged statements out of context, the State ignores the fact that such testimony indicates, at most, the victim thought Martin had taken advantage of her intoxication.

Because we find, consistent with Martin's assertion at oral argument, that the hearsay issue, *if raised previously,* was apparently *not* a basis for the decisions by the Louisiana Supreme Court on direct appeal, or by the state district court or federal district court on post-conviction review, we decline to consider the State's contention.

 To demonstrate the requisite prejudice as a result of the claimed cumulative error, Martin points to the magistrate judge's statement, in his report and recommendation, that, under a *de novo* review, he might have reached a different conclusion than did the state district court. But, noting that Sweet's testimony, with the

exception of that about the aggravated nature of the rape, was corroborated by a number of other witnesses and other evidence, and that Sweet's testimony concerning the aggravated nature of the rape was, to some extent, corroborated by Martin's visible physical injuries shortly after the murder, the magistrate judge recommended that, pursuant to AEDPA's standards, habeas relief could *not* be granted.

Concerning this cumulative-error-issue, and as noted for each of the earlier issues, we conclude that reasonable jurists considering the question would *not* be of one view that, pursuant to § 2254(d)(1), the state court's decision was based on "an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court". Accordingly, habeas relief *cannot* be granted.

### III.

For the foregoing reasons, the denial of habeas relief is

*AFFIRMED.*